IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
v. ) MAGISTRATE NO. *17-1520*
) **[UNDER SEAL]**
BRAD LANESE )

## **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Eric Harpster, being duly sworn, do depose and state the following:

### INTRODUCTION AND BACKGROUND

1.      I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I am currently employed as a Task Force Officer for the Drug Enforcement Agency, and have been so employed since 2008. I am assigned to the Pittsburgh, PA office. I have been a Pittsburgh Police Officer since 2000. My duties and responsibilities include participating in the investigation and prosecution of persons who violate federal criminal law. As a result of my training and experience, I am familiar with federal criminal law and know that, in accordance with Title 18, United States Code, Section 1958(a), it is unlawful for an individual to use Interstate Commerce Facilities With the Intent to Commit A Murder-for-Hire. This affidavit is being submitted for the specific purpose of establishing probable cause for a criminal complaint. Therefore, I have not included every fact known to me concerning this investigation.

1

3.     I am currently participating in the investigation of Brad LANESE and this affidavit is in support of a criminal complaint filed against Brad LANESE. The statements contained in this Affidavit are based on my experience and background as a Task Force Officer, and the investigation of Brad LANESE. The investigation of Brad LANESE is based upon the following sources of information:

     a.    confidential source information;

     b.    consensually monitored and recorded communications;

     c.    oral and written reports about this and other investigations that I have received, directly or indirectly from local law enforcement

     d.    surveillance that has been reported to me, either directly or indirectly

     e.    independent investigation by local law enforcement organizations

     f.    reports from controlled/undercover drug purchases

4.     Except where otherwise noted, the information set forth in this Affidavit has been provided to me directly or indirectly by the Pittsburgh Police Bureau of Police, Drug Enforcement Agency, and/or the Bureau of Alcohol, Tobacco, Firearms and Explosives. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among many statements made by others, and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance (except where otherwise indicated) does not set forth my personal observations, but rather has been provided directly or indirectly through other law enforcement officers who conducted such surveillance.

2

5.    This investigation, as explained in further detail below, has revealed the plot of Brad LANESE to hire your affiant, acting in an undercover capacity, to murder L.D. Your affiant adopted the persona of ""Deeds"", a name by which LANESE was introduced to your affiant and used when interacting with the affiant. The following summary is based on information from CS 1, from your affiant's personal undercover conversation with Brad LANESE, and from Brad LANESE's recorded statements. In addition, portions of your affiant's conversation with Brad LANESE and Brad LANESE's recorded statements will be replicated in draft format below. The following is a summary of the events that establish that there is probable cause that Brad LANESE committed the crime of Use of Interstate Commerce Facilities with The Intent to Commit A Murder for Hire.

6.    According to information provided by CS 1, and as confirmed by recorded conversations and statements made by LANSESE to me in my undercover capacity, LANESE previously owned and operated a large marijuana grow operation with his cousin C.B., in Northern California. L.D. is the wife of C.B. LANESE was making substantial sums of money as a result of the grow operation. However, LANESE soon began having difficulties with L.D.  As a result of these difficulties, LANESE was asked to leave the property. C.B. gave LANESE $29,000 to leave the grow operation. Back in Pittsburgh, PA, LANESE quickly spent the $29,000 and the large amount of other cash profits he made from the grow operation. LANESE became disgruntled that he had exhausted his profits from the operation and that C.B. and L.D. were still making large amounts of money without him. LANESE blamed L.D. for his separation from the grow operation and the profits associated from it. This animus caused LANESE to develop a plan to rob the grow

operation and those involved in it, including L.D., C.B., and even his own son Billy Lanese, another worker at the grow operation.

7.     To accomplish this goal, LANESE first approached a confidential human source, hereinafter "CS 1", operated by the Pittsburgh Bureau of Police and the DEA, in January of 2017. LANESE would re-approach CS 1 in October of 2017. CS 1 recorded both telephone and personal conversations that he had with LANESE. Portions of some of these calls will be reproduced below. LANESE proposed to CS 1 that he and CS 1 travel to Northern California in order to rob L.D. and C.B. of the profits from the grow operation. LANESE enlisted the help of CS 1 to plan and execute the robbery. LANESE also approached CS 1 for financial support to travel and commit the robbery. LANESE needed a financial backer for his robbery plan as he had exhausted all of his funds. In exchange for CS 1's help and financial backing, LANESE promised CS 1 cash and marijuana proceeds from the robbery.

8.     CS 1 then suggested that CS 1 and LANESE enlist the help of CS 1's associate, an individual introduced to LANESE as "Deeds", your affiant acting in an undercover capacity. CS 1 told LANESE that "Deeds" could provide logistical support and actually help in the commission of the robbery. CS 1 also stated that "Deeds" could provide firearms including automatic weapons for use in the robbery. LANESE grew excited at the prospect of enlisting a skilled mercenary such as "Deeds" and continued to contact CS 1 in order to set up their trip to California. LANESE and CS 1 agreed that on their first trip to California, they would scout the robbery location and meet with "Deeds" after to coordinate the plan. In order to plan for the robbery, LANESE and CS 1 decided that LANESE and CS 1 would fly to San Francisco, California, and then travel by car to

4

the grow operation. CS 1 would then purchase marijuana from C.B. as LANESE was not welcome at the operation. CS 1 and LANESE would then meet with "Deeds" to plan the robbery.

9. The grow operation is comprised of locations and properties in Humboldt County, California, including but not limited to: a large acreage of marijuana grow fields, a storage facility, and C.B. and L.D.'s home in Whitethorn, CA. In late October 2017, LANESE and CS 1 travelled to San Francisco, California, by plane. After CS 1 and LANESE landed in California, LANESE first mentioned to CS 1 that he wanted to kill L.D. The next day, LANESE and CS 1 travelled by car to Whitethorn, CA. During this trip, CS 1 was able to record the conversation in the car between CS 1 and LANESE. During the trip, LANESE told CS 1 that he no longer solely wanted to rob the operation, but that he wanted to kill L.D. This conversation will be provided in further detail below. After LANESE proposed killing L.D. by giving her a fatal overdose of heroin/fentanyl in the distant marijuana fields and pushing her car over a cliff, CS 1 stated that it is possible that "Deeds" could be the person to accomplish this goal.

10. After a long car ride to Whitethorn, CA, CS 1 conducted a controlled purchase of marijuana from C.B. CS 1 and LANESE then travelled to Garberville, CA in order to ship the marijuana back to Pittsburgh. LANESE packaged the marijuana and sent it to an address in Pittsburgh, PA. The package was intercepted by US Postal Inspectors in Pittsburgh. The Honorable Robert Mitchell authorized a search warrant for the package. When the warrant was executed, approximately 6 pounds of marijuana was recovered.

11. On that same day in November 2017, LANESE and CS 1 met with "Deeds", your affiant, in Ukiah, CA. LANESE told "Deeds" that he no longer wanted to rob C.B., but that he wanted "Deeds" to kill someone instead. Your affiant (in an undercover capacity) stated that this

5

could be accomplished. LANESE then told "Deeds" that he wanted "Deeds" to wait in the marijuana fields where L.D. would go every night to use narcotics. LANESE then wanted "Deeds" to wait on the side of the road and pretend that his vehicle was disabled. When L.D. stopped to help "Deeds", LANESE then wanted "Deeds" to forcibly inject L.D. with heroin laced with fentanyl and push L.D.'s car over a cliff to make it look like a fatal overdose. LANESE stated that once L.D. was dead, C.B. would invite him (LANESE) back to the grow operation. LANESE told "Deeds" that he would then be able to pay him once he was back working on the grow operation and that money would not be an issue.

12.     After this conversation, "Deeds" (your affiant) brought CS 1 and LANESE to his car in a parking lot. "Deeds" then displayed several firearms to LANESE. Before departing, "Deeds" told LANESE that he would need the address to commit the murder. Your affiant would later text CS 1 asking to get the address from LANESE. CS 1 would then provide to "Deeds", via LANESE, the Whitethorn address.

13.     CS 1 and LANESE then traveled back to the Pittsburgh area. CS 1 and LANESE made plans to meet with "Deeds" again to finalize plans. In mid-November 2017, CS 1 and LANESE were to meet "Deeds" at a location in Pittsburgh. However, prior to the meeting, LANESE refused to meet with "Deeds" for fear of exposing himself to further risk. LANESE did however participate in a three-way phone call with "Deeds" and CS 1 where LANESE reaffirmed that he wanted "Deeds" (your affiant) to commit the murder.

14.     Note: your affiant has reproduced limited portions of pertinent recorded personal

and telephone calls for the limited purpose of establishing probable cause. These portions of

reproduced recordings are not meant to be verbatim transcripts of the recordings nor are they the

full recordings. These portions presented below are the affiant's personal recollection upon

listening to the recorded conversations. As this affidavit is being submitted for the specific purpose

of establishing probable cause for a criminal complaint, I have not, therefore, included the full

versions of recordings I have listened to nor have I included portions of all retained recordings.

15.     On October 5, 2017, CS 1 met with LANESE in the Pittsburgh, PA area. CS 1

audio recorded their conversation:

> LANESE: What do you want to do, do you want to go?
> CS 1: Look, I'm gonna tell you this much, I want to go if it's gonna be worth it for us.
> LANESE: I can't promise nothing, can you get some money and we can get some weed.
> CS 1: We get a plan in place and then go out the following week and just make it happen cause the second time were gonna fly out and drive back.
> LANESE: ok ok....listen here's what I know for a fact
> LANESE: Because my son's out there and he has been feeding me info.
> CS 1: Right, Right
> LANESE: So right now, they are harvesting ok, it's the big outdoor
> CS 1: Right
> LANESE: ok so, that there, okay
> CS 1: About how many pounds
> LANESE: Last time it was 360 lbs, they grow 300, every time they plant 1000 plants
> CS 1: Right
> LANESE: It all outdoor, that I know for a fact
> CS 1: Right
> LANESE: okay, it's the cold hard cash, I know, I know they got a safe, ok I know they always got at least 30 or 40 g's because they have to pay their clippers everyday when they are done, and that's where they do it all um...
> CS 1: Where are they keeping the bulk of the cash?

LANESE: That one, they rented a storage facility which is right next to their home
CS 1: Right
LANESE: Cause I'm gonna break, I'm gonna break their fuckin fingers even after it's all done, I'm gonna break his fingers and his knees.

16.    LANESE and CS 1 then had a phone conversation on October 20, 2017 regarding

their upcoming trip to California:

LANESE: Hey brother
CS 1: Sorry about not getting back to you, I had guys in the truck and couldn't talk
LANESE: That's ok man, I figured when you were ready you would call me
CS 1: Listen, I am ready, we need to get this planned in the next seven days and go out there and execute
CS 1: Listen Brad, when we get out there we are going to get our plan in place, were gonna get out there, we'll coordinate the vehicle and well make it happen.
LANESE: Yeah, oh yeah
CS 1: I got some other stuff worked out for us, we're not going to have to travel out there with any tools or equipment
CS 1: I know you want your retribution, but we can't be too reckless listen to me
LANESE: Dude, listen to me, its more business than pay back,
LANESE: I've already come to grips with all of that.
LANESE: I'm not going to be a loose cannon don't worry.

Your affiant notes that when CS 1 stated that "we're not going to have to travel

out there with any tools or equipment", he is referring to having firearms for the robbery

available in California. CS 1, LANESE, and your affiant in his undercover capacity as "Deeds"

would discuss the robbery and murder for hire in construction terms. CS 1 and later "Deeds" would

explain to LANESE that using this terminology would help to obfuscate their true plans and

insulate them from law enforcement detection and prosecution.

17.    On October 31, 2017, LANESE and CS 1 flew from Pittsburgh, PA to San

Francisco, CA. It was on this night that LANESE first stated that he may want to have L.D.

murdered. The next day, CS 1 rented a car for CS 1 and LANESE to drive to Whitethorn, CA for

the controlled purchase and to meet "Deeds" in Ukiah, CA. Because of the distance, CS 1 and

LANESE were in the car for numerous hours. In the beginning of the car ride, LANESE called his

son, Billy Lanese, in order to get the address of Carmen's house and information regarding it.

This information would help CS 1 conduct the controlled purchase. During the car ride, CS 1 was

able to record their conversation:

> LANESE: We just need to find out where his heads at
> CS 1: Yeah
> LANESE: Ok
> LANESE: But he cannot know what we are doing?
> CS 1: I understand
> LANESE: I just know that about him. He won't be able to live with himself, he's
> not like that.
> CS 1: Especially after you have her killed
> LANESE: Thank you
> CS 1: When we go through here, show me the cliffs that you are talking about
> LANESE: It will look like an accident, that's the long term deal.
> CS 1: I like your idea, like inject her with heroin and throw her over the hill, make
> it look like a DUI accident.
> LANESE: Yes, dude it happens fucking ten times, all day up in this fucking place.
> They don't even investigate half of these fucking things dude.
> CS 1: So what do you do? Stun gun her and inject her with heroin?
> LANESE: Exactly
> CS 1: Push her truck off the mountain?
> LANESE: Exactly
> LANESE: I'll do it. I will fucking gladly fucking be that fucking guy that does
> that. I've rehearsed this in my mind a thousand times.
> LANESE: Honest to god. I know the exact spot.
> CS 1: Right
> LANESE: Wait until I show you this, youre going to be like oh my god perfect,
> its one little fucking accidental not turn of the wheel.
> CS 1: Right
> LANESE: You know
> LANESE: With her out of the picture, Carmen would bring me right back in.
> LANESE: She's a fucking bitch, she knows how to manipulate
> CS 1: Right
> LANESE: And Carmen, here's the thing, all my life
> CS 1: Right
> LANESE: I told him one thing, don't ever let a woman control you
> CS 1: Right

9

LANESE: They always will control you
LANESE: What's the first fucking thing he did
CS 1: Got controlled by a woman
LANESE: Yep
CS 1: You must really hate this broad, I can hear it
LANESE: Oh bro, dude, I do
CS 1: How long have you been wanting this in your head honestly?
LANESE: Since the day I left
CS 1: Which is how long?
LANESE: Fucking four years, four years
CS 1: You've been setting this up?
LANESE: Every day, every day, I haven't slept because what this person did to me
LANESE: I wake up dreaming about this
LANESE: Here's the thing, I can never live a normal life until I take care of this person.
CS 1: Because that's your closure
LANESE: That's my closure, exactly
LANESE: I kid you not, every single fucking day for four years, I've fucking plotted how I am going to get this person back.

Later on in the car ride, LANESE and CS 1 would continue to talk about LANESE's evolving plan from robbery to murder.

CS 1: So, if I gave you ten minutes with them when we were getting cleaning out the safe and packing up the pounds,
LANESE: That's all I need
CS 1: What do you want to do?
CS 1: Any special tools you need?
LANESE: Baseball bat
LANESE: That's all I need
CS 1: Short term it's about the money and the weed, long term its about killing her and taking over the property?
CS 1: Right?
LANESE: Yes
LANESE: Exactly
CS 1: That's your plan?
CS 1: That's what you want to do?
CS 1: You in?
LANESE: 100%
CS 1: But, I think that move, that move it is best to have someone do that while were in Pittsburgh. Like we can use one of my people to take care of that?
LANESE: What?

10

CS 1: [L.D], the overdose, putting her over the bridge
LANESE: That would fucking work
CS 1: Well talk to dirty "Deeds" about that
CS 1: Dirty "Deeds" is the guy to do that
LANESE: Whatever the cost
LANESE: This is eating me alive, literally
LANESE: You'll see, this road, its perfect
LANESE: I've never fucking disliked someone so much in my life

While driving in a particularly mountainous area, LANESE discussed the specifics of his plan

in greater detail:

LANESE: Wait until you see what I am going to show you,
CS 1: Ok
LANESE: it is a no fucking brainer, because the cliff
CS 1: Are you ready to take her out?
LANESE: Yes, 100 %
LANESE: 1000% percent
CS 1: Ok
LANESE: Hands down, not even an inkling of doubt
LANESE: This is something that has to be done
LANESE: It's a battle between good and evil. She's fucking evil.
LANESE: But, wait until you see the cliffs
CS 1: Yeah
LANESE: See where this white line is?
CS 1: Fuck
LANESE: Beyond that white line there is a vertical fucking cliff
LANESE: Its only a two lane road
LANESE: The heroin will be enough to kill her

LANESE continues to talk about his hatred for Lisa and how he's visualized his plan to kill her

before.

CS 1: You got to hate this bitch, I don't blame you. Now that you told me the
story
LANESE: With every, every fucking cell in my body.
LANESE: Look, I've never fucking thought about hurting a woman in my life,
but what this broad has fucking done, is beyond fucking anything.
CS 1: You want to act like a man, well treat you like a man.
LANESE: There's no guardrails up there
CS 1: Yeah

11

LANESE: That makes it easy, you don't want to have it hit anything on the way over.

LANESE: It my mind I've fucking played it over, zap her

CS 1: Zap with with a stun gun?

LANESE: Yes

LANESE: Then shoot her with the heroin

CS 1: Yep

LANESE: Then have her in the fucking driver's seat

LANESE: I was just going to drive it and then fucking jump out

CS 1: Just put it in drive, just put her foot on it

LANESE: Any footprints I might leave, just dust them out

CS 1: Right

LANESE: Eliminate the obstacle

18.     As LANESE and the CS 1 approached the area near the grow operation, LANESE

began to discuss how the area would be well suited for the murder:

LANESE: This is the one

LANESE: That is the one

CS 1: Right by the white marker, the one with the lines on the pole

LANESE: Yep, yep

CS 1: Looks like a little smiley face on the pole right there

CS 1: This is a great place to get rid of her, that is a great way to get rid of her

LANESE: That's the one right there

CS 1: The horseshoe bend?

LANESE: Yep

CS 1: That's perfect

LANESE: There are no trees to stop you at all

CS 1: Yep

LANESE: That's the one that I've had my mind on

LANESE: See right there that fucking tree was hit by a car

LANESE: This is the one

LANESE: This....is....the...one

LANESE: It wasn't the one back there

LANESE: Look straight down, boom, boom, boom

CS 1: That's a perfecting fucking marking sign right there. She would go right off there

LANESE: Nothing would stop that fucking vehicle.

CS 1: That's your in, that gets you back where you want to. That accomplishes the goal

LANESE: Yep

LANESE: Its all about this vertical

12

At this point, in the conversation, CS 1 and LANESE actually pull the car over to the side of the road and LANESE shows CS 1 the cliff over which L.D.'s car and body should be pushed. The conversation continues when they get back into the car:

> CS 1: That's perfect Brad and you wouldn't have to worry about any suspicion
> LANESE: No
> CS 1: of you killing her.
> LANESE: Exactly brother
> CS 1: And then [C.B] would reach out to you after that
> LANESE: That night, are you kidding me, that night
> LANESE: He would fucking want me here
> CS 1: Right
> LANESE: It wasn't the problem between me and [C.B]
> LANESE: I'm mad at him for letting her take control
> CS 1: This is the way of doing it without
> LANESE: Exactly bro, I can't believe you are on the fucking same page as me
> CS 1: Absolutely, look it makes more sense to me in the long run
> LANESE: Because that a fucking, that's a fucking constant money tree
> CS 1: Its an income every three months
> LANESE: Honest to god
> LANESE: Yes, yes dude
> CS 1: Well just have to work it out with "Deeds", get it done you know what I mean. Pay him one time were not going to tell him about the residuals
> LANESE: Fuck no, whatever the fuck I got to do
> CS 1: Pay him out of the first grow only, you know
> LANESE: Yeah
> CS 1: He don't care as long as the money is right
> LANESE: Right, right
> LANESE: Their house is coming up on the right
> CS 1: Sure this is something that you want to do?
> LANESE: Oh fuck yeah
> LANESE: Yeah
> CS 1: Just making sure
> LANESE: Yeah
> CS 1: Ok, im in with you
> CS 1: Partners, right, 50/50
> LANESE: You got it, all the way
> CS 1: I'll work with "Deeds" to make it happen

19.    After a very lengthy car ride and conversation, CS 1 and LANESE arrived in Whitethorn, CA to conduct the controlled purchase of marijuana from C.B. at his house. CS 1 had

13

to drop LANESE off at a location a distance away from the house, as LANESE could not be seen by C.B. or L.D. CS 1 made the controlled purchase from C.B. for approximately 6 pounds of Marijuana. CS 1 then picked up LANESE again. LANESE then mailed the marijuana back to a predetermined location in Pittsburgh that was provided to CS 1. As detailed above, US Postal Inspectors would later intercept the package, execute a search warrant on the package, and recover the marijuana.

20.     After mailing the package, LANESE and CS 1 travelled another few hours to meet "Deeds". "Deeds" (your affiant) then contacted CS 1 and LANESE again at approximately 7:00 pm and stated that "Deeds" would be arriving in Ukiah, CA shortly and had to eat because he was driving all day and did not stop to eat. "Deeds" stated that when he arrived he would contact them and let them know what he found.

21.     Agents from Alcohol, Tobacco and Firearms (ATF) Pittsburgh Office as well as from the San Francisco Office and DEA Agents from the Santa Rosa office met at a predetermined location where your affiant was provided several firearms fully operable. The firearms provided where an AR-15 with bump stock, AK47, Mac-10 with a silencer, Glock pistol with a 30 round magazine and a Sig Saur handgun.

22.     At approximately 8:43 pm, the CS 1 and LANESE arrived and entered the meet location. CS 1 and LANESE approached your affiant and CS 1 referred to your affiant as "Deeds" and introduced "Deeds" to LANESE who he introduced as "B". Once the greetings concluded LANESE sat down in the booth on the inside near the window across from your affiant and CS 1 sat on the outside. LANESE stated that he did not want to talk about the job inside the restaurant and wanted to wait to go outside after they ate. For the first few minutes

14

LANESE and CS 1 ordered food and drinks along with non-pertinent conversation about how CS 1's family was doing.

23. CS 1 then began the conversation and stated that the original plan of robbing C.B. had changed but CS 1 thought that "Deeds" would like the new plan better. CS 1 then stated to LANESE that it was LANESE's plan and to go ahead and tell "Deeds" the details. LANESE stated that instead of robbing C.B., he wanted to kill someone instead. LANESE stated that there may be one problem that "Deeds" may have and LANESE stated "It's not a man?" "Deeds" responded that's not a problem and that the only work he won't do is "build kids room" meaning that "Deeds" would not kill kids. LANESE became extremely excited and said he knew right away that "Deeds" (your affiant) was the man for the job and how he knew CS 1 would get the right person to carry the job out. LANESE went on to say that LANESE wanted L.D. killed. LANESE explained that L.D. was a heavy heroin user and every evening L.D. would go to the marijuana fields which was located at the end of a dirt road.

24. LANESE explained that the location of L.D.'s residence and the marijuana fields were extremely secluded and in order for L.D. to travel to the marijuana crops she had to travel on an extremely dangerous windy road through the mountains. LANESE went on to explain that he wanted "Deeds" to pull over and act as if he was having car trouble. LANESE stated that the kind of person L.D. was that, she would stop and offer assistance. LANESE stated that when L.D. stopped to offer assistance, "Deeds" should forcibly inject her with heroin laced with fentanyl in her chest and kill her making it look like an overdose. LANESE stated that once she was dead there were several places along the route that L.D. and her vehicle could be pushed off the road and over the edge of extremely high cliffs making it look like L.D. overdosed and crashed over

15

the hillside. LANESE stated that because it was so secluded that it would be days before anyone found her and it would not raise any suspicions with law enforcement or his cousin.

25.    "Deeds" stated that everything sounded ok, but "Deeds" thought it would be too risky to attempt stopping her on the main road because if something is going to go wrong it will happen then, so "Deeds" suggested that the dirt road would be a better location to attempt to stop her and inject her with the heroin. LANESE agreed and again was very excited and again stated that he knew "Deeds" was the right man for the job and agreed with the idea of grabbing L.D. on the dirt road. "Deeds" and LANESE continued to discuss the area that the homicide would take place and LANESE stressed that by doing it this way it would give "Deeds" ample time to inject L.D. with the heroin, drive her car to the spot in the road that LANESE suggested, which was in the immediate area, put her in the driver's seat and push it over and have plenty of time to leave the area because it would be days until they found the car. LANESE provided "Deeds" with a description of L.D.'s vehicle. "Deeds" indicated that the job would be no problem but it would take a couple weeks to complete the "site survey" and get "estimates" for the job.

26.    At that point, CS 1 stated that LANESE was not going to be able to pay up front or even immediately. CS 1 stated that it would take a few weeks to pay for the job once it was completed. LANESE then explained that after the authorities find L.D.'s body, C.B. would contact LANESE and have him come back to the farm to run the grow operation. LANESE stated that he would be able to pay him a few weeks after completion of the job. "Deeds" (your affiant) then agreed to complete the job for future payment and was willing to wait a few weeks.

27.    LANESE explained that the money would be no issue and CS 1 asked if "Deeds" brought the tools for the job. "Deeds" stated that he did and they were outside in the vehicle. CS

16

1 asked LANESE if he wanted to go out and see them and LANESE responded that he did. Although LANESE now wanted "Deeds" to murder, L.D. by injecting her with a fatal dose of heroin/fentanyl and then pushing her over the cliff, LANESE was still interested in seeing the firearms that "Deeds" had made available for the previous plan. Further, in order to gain LANESE's further trust and show him that "Deeds" was a reliable and capable mercenary, your affiant still continued to show him the firearms. "Deeds", LANESE and CS 1 left the location and proceeded to the parking lot where "Deeds" parked his vehicle. On the way to the vehicle "Deeds" informed LANESE that it was going to take a few weeks to conduct surveillance of L.D. and get her habits so he could successfully complete the "remodels", meaning the completion of the homicide. "Deeds" informed LANESE that after he completed the surveillance he would travel to Pittsburgh to meet with LANESE one final time to finalize the plans. "Deeds" stated that he would need L.D.'s address immediately and if possible the location of the dirt road.

28.    "Deeds", LANESE and CS 1 arrived at the rear of the vehicle and "Deeds" opened the rear hatch of the vehicle and opened a large bag that was in the vehicle. "Deeds" first removed the AK47, then the AR-15 which had the bump stock. "Deeds" pointed out the bump stock and explained to him that that was the same type of bump stock that was used by the Vegas shooter to convert the rifle to fully automatic. "Deeds" then pulled out the Mac-10 with the silencer and LANESE became really excited and loudly expressed his pleasure along with CS 1 who stated "I told you "Deeds" was the man for the job." "Deeds" then pulled out the Glock pistol with the 30 round magazine and the Sig Saur pistol. "Deeds" then closed the hatch and reminded LANESE that "Deeds" would need the address so he could start the sight surveys for the job. Most of the conversation was coded by speaking as if it was a contracting job.

17

29.     The CS and LANESE re-entered the restaurant and "Deeds" entered the vehicle and left the area and travelled immediately back to the pre-arranged location where surveillance was de-briefed. All the firearms were turned back over to the custody of the ATF.

30.     As discussed in the November 1, 2017 meeting in California, CS 1 and LANESE made arrangements to meet with "Deeds" one more time in Pittsburgh in order to finalize details for the murder. However, LANESE thereafter became reluctant to meet with CS 1 and "Deeds" as LANESE had pledged his car title as collateral for the murder until payment could be made. LANESE feared that turning over the car title would expose his full name to "Deeds".

31.     However, CS 1 and "Deeds" (your affiant) participated in a recorded call with LANESE on November 14, 2017 to further discuss the planned murder:

> CS 1: I calmed everything out here, but there's a couple things we need to address.
> CS 1: First off, I got you on speaker phone with "Deeds"
> CS 1: Say hi "Deeds"
> CS 1: The title is off the table
> CS 1: Upon further review, we thought it is best this way so no one really knows who anybody is
> CS 1: But you know where I am going with that
> LANESE: Absolutely
> "Deeds": This is on credit, and I am trying to keep CS 1 out of the middle
> CS 1: But because he is going to do it on credit, its going to be 30K as opposed to 20K
> LANESE: Ok, and that will come when I am up there
> LANESE: I am willing to give blood right now, but I don't have those funds.
> "Deeds": Problem is there are some issues with our original plans,
> "Deeds": I've been up there for a couple of days
> "Deeds": That dirt road is going to be a problem
> LANESE: That was just one of her routes, there was no guarantee
> "Deeds": I agree with you 100%, that's why we needed to meet here in Pittsburgh
> "Deeds": I want to make sure that this gets built as perfectly as possible
> LANESE: Well there is nothing else that I can tell you that can construct this in any other way.
> LANESE: I don't know all the routines
> "Deeds": That's my job
> LANESE: I gave you all the information I got, that's all I have.

"Deeds": I understand

LANESE: I have taken on this commitment, and I am letting you know verbally right now, that I am taking this on and I know the ramifications if I falter.

LANESE: This isn't a joke, I know what I am signing up for.

CS 1: He might have a couple of more questions for you, but after tonight this is going to be the last time we all talk.

"Deeds": Once this conversation is done, that number you have is a throw away, it will never work again.

"Deeds": Get rid of that number

"Deeds": When I hang up, there is no going back. There is no robbery, it is straight doing my job

LANESE: I got you and I am willing to accept that

## APPLICABLE STATUTE AND ELEMENTS OF THE OFFENSE

32.     Your affiant believes that there is probable cause to believe that Brad LANESE

has violated 18 U.S.C. 1958(a). The law provides:

> Whoever travels in or causes another (including the intended
> victim) to travel in interstate or foreign commerce, or uses or
> causes another (including the intended victim) to use the mail or
> any facility of interstate or foreign commerce, with intent that a
> murder be committed in violation of the laws of any State or the
> United States as consideration for the receipt of, or as
> consideration for a promise or agreement to pay, anything of
> pecuniary value, or who conspires to do so, shall be fined under
> this title or imprisoned for not more than ten years, or both; and if
> personal injury results, shall be fined under this title or imprisoned
> for not more than twenty years, or both; and if death results, shall
> be punished by death or life imprisonment, or shall be fined not
> more than $250,000, or both. 18 U.S.C. § 1958(a).

> Further, subsection (b) of this statute defines:

> **(1)** "anything of pecuniary value" means anything of value in the
> form of money, a negotiable instrument, a commercial interest, or
> anything else the primary significance of which is economic
> advantage;
> **(2)** "facility of interstate or foreign commerce" includes means of transportation
> and communication; and
> **(3)** "State" includes a State of the United States, the District of
> Columbia, and any commonwealth, territory, or possession of the
> United States. 18 U.S.C. § 1958(b)

19

The elements of the offense are as follows:

That the defendant:

(1) With the intent that a murder be committed in violation of the laws of any State or the United States;
(2) As consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value;
(3)
    a. traveled in;
    b. conspired to travel in;
    c. caused another (including the intended victim) to travel in;
    d. conspired to cause another (including the intended victim) to travel in;
    e. used the mail or any facility of;
    f. conspired to use the mail or any facility of;
    g. caused another (including the intended victim) to use the mail or any facility of; or
    h. conspired to cause another (including the intended victim) to use the mail or any facility of...
    interstate or foreign commerce

33.     Your affiant believes that there is probable cause to believe that Brad LANESE traveled in interstate commerce from Pennsylvania to California with the intent that L.D. be murdered in consideration for paying your affiant a sum of $30,000 dollars payable after the death of L.D. when LANESE would be able to profit from the marijuana grow operation again. Further, your affiant believes that there is also probable cause to believe that Brad LANESE used his cell phone, an interstate commerce facility, in order to hire your affiant to murder L.D. for $30,000.

20

34.    Pursuant to the foregoing, your affiant respectfully submits there is probable cause to believe that Brad LANESE committed the offense of use of interstate commerce facilities with the intent to commit a murder-for-hire.

The foregoing is true and correct to the best of my knowledge, information, and belief.

ERIC HARPSTER
Task Force Officer - DEA

Sworn and subscribed to before me
this 4th day of December, 2017.

HONORABLE MAUREEN KELLY
United States Magistrate Judge

21